THE MONARCH CAP SCREW AND MANUFACTURING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5521.    Promulgated December 10, 1945.

*John W. Scott, Esq.*, for the petitioner.
*Z. N. Diamond, Esq.*, for the respondent.

OPINION.

SMITH, *Judge*: Our only question in this proceeding is whether the respondent erred in disallowing petitioner's application for excess profits tax relief under section 722. The pertinent provisions of the statute are as follows:

SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

* * * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operattion, a difference

in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished.  *  *  *

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

Section 722 is a general relief measure.  Its purpose is to "afford relief in meritorious cases to corporations which bear an excessive tax burden because of an abnormally low excess profits credit."  (Senate Finance Committee, Rept. No. 1631, 77th Cong., 2d sess.).

The plan of the statute is to bring about an increase, in such cases. in the statutory excess profits credit.  The excess profits tax is computed on the statutory "adjusted excess-profits net income" (sec. 710 (a) and (b))  The adjusted excess profits net income is the "excess profits net income" as defined in section 711, minus the specific exemption provided for in section 710 (b) (1) and the excess profits credit provided for in section 712 (section 710 (b) (2)).  Under section 712 (a) domestic corporations which were in existence before January 1, 1940, are entitled to an excess profits credit based either on income (section 713) or on invested capital (section 714), whichever results in the lesser tax.  The credit based on income is 95 percent of the "average base period net income," with certain adjustments for capital additions and reductions (section 713 (a) (1) (A), (B), (C)).  Ordinarily the "base period" covers the years 1936 to 1939, inclusive, as to corporations in existence for that period (section 713 (b) (1) (A)).  Thus, the relief afforded by section 722 is gained through a "reconstruction" of, or increase in, average base period net income, and a consequent increase in the excess profits credit.

Section 722 substantially as it is now constituted became a part of the Internal Revenue Code with the enactment of the Revenue Act of 1942.  It first appeared in "token" form in section 201 of the Second Revenue Act of 1940 as a part of the Excess Profits Tax Act of 1940. It was enacted in more complete form by an amendment appearing in the Revenue Act of 1941 (sec. 6, Excess Profits Amendments of 1941), and was further amended by section 202 of the Revenue Act of 1941. section 222 of the Revenue Act of 1942, Public Law No. 21, approved March 31, 1943, Public Law No. 201, approved December 17, 1943, and section 206 (a) of the Revenue Act of 1943.

The benefits of section 722 are made available only where a taxpayer establishes that the excess profits tax complained of is "excessive and discriminatory," as those terms are defined in the statute, and further establishes what would be a fair and just standard of normal earnings for the base period.

While the statute carries its own definition of "excessive and discriminatory" it does not define the term "an inadequate standard of normal earnings." The word "normal" is susceptible of different, or varying meanings. Webster's New International Dictionary defines it as meaning:

According to, constituting, or not deviating from, an established norm, rule, or principle; conformed to a type, standard, or regular form; performing the proper functions; not abnormal; regular; natural; analogical.

Still the question might arise as to whether the "normal earnings" referred to in the statute are those of the particular taxpayer or those of the industry as a whole. In relation to its context we think that the whole phrase of "an inadequate standard of normal earnings" refers to a standard or measure of earnings which falls below that established over a reasonable length of time and under normal conditions by the taxpayer or by other taxpayers engaged in the same or a similar business under comparable conditions. It is such a standard as would result in "an abnormally low excess profits credit." Senate Finance Committee Report, *supra*.

We first consider the question of whether the petitioner has proved itself entitled to relief under section 722 (b) (2), upon which the petitioner places its chief reliance. That subsection is applicable if "the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry." Petitioner contends that its business was depressed in the years of the base period because of the low prices which it received for its products. Petitioner's profit and loss statements show that its profits in each of the base period years exceeded those of any prior year since 1925. There were operating losses in 1929, 1930, and 1931 and a profit of only $139.34 in 1932. The profits were over $4,000 in 1936, the first base period year, over $3,000 in each of the years 1937 and 1939, and approximately $2,000 in 1938. Petitioner's average profits for the four base period years were substantially greater than its average profits for its entire existence up to 1941. The losses in 1929, 1930, and 1931, and the small profit in 1932, may be attributed to the complete change in the nature of petitioner's business from the manufacture of brake bands to the manufacture of cap screws, which occurred in 1929. Apparently petitioner had fully recovered from the effects of the change by 1936, when it had earnings comparable to those of 1924 and 1925, its best years prior to the taxable year 1941.

The evidence as a whole fails to make any strong showing that petitioner's business was depressed to any great extent during any of the base period years.

The mere fact that base period profits were not large would not necessarily mean that the business was depressed. Particularly would this be true where, as in the instant case, large profits were not customary in the taxpayer's history. The situation might be different if the taxpayer had greatly expanded its business or made substantial capital outlays from which a proportionately larger return of profits might reasonably have been expected. But those are not the facts here.

The petitioner's claim for relief under subsection (b) (2), as presented to the respondent in its claim on Form 991, was on the ground that its profits during the base period years were affected by a price war. The petitioner did not in such claim, or at any time thereafter, furnish respondent with any computation or evidence relating to a reconstruction of base period net income with respect to any factor or reason for relief other than the alleged price war.

In *Blum Folding Paper Box Co.*, 4 T. C. 795, we stated:

> The scheme of the statute is that applications for relief under section 722 are to be presented in full to the Commissioner, who handles them administratively and passes upon them in the first instance in an effort to settle them without suit. This means that the applications must set forth not only the grounds for relief, but also a statement of the facts which the Commissioner is to consider in support of the reasons given. Additions are made by amendments before the claim is acted upon by the Commissioner. The Tax Court merely reviews his final determination. See sec. 732 (a), I. R. C. The taxpayer may not, as here, file a superficial claim, leaving the Commissioner in ignorance of the possible factual support for the claim, and then, after the resulting disallowance, come forward for the first time with the supporting statement of facts. That information is not a part of the application and consideration of it is beyond the scope of review by the Tax Court.

Since the function of the Tax Court in cases arising under section 722 is to review the respondent's determination upon the facts presented to him, it is apparent that only evidence to support those facts is germane to the appeal presented to us. Any evidence directed toward proving other facts is inadmissible.

The principal facts alleged in the claim on Form 991, and those upon which petitioner seems to have relied in its application to the respondent for relief are: (1) That the manufacture of cap screws and bolts is a highly competitive business and one in which the margin of profits is small; (2) that because of the depression in the early thirties there were many mergers in the industry which resulted in increasing the quantity and "line" of the output of the merging companies; (3) that at about that time a "completely chaotic condition developed in the industry which resulted in a price war"; (4) that petitioner had neither the capital nor the facilities to compete with the large manufacturers of standard cap screws and bolts; (5) that petitioner was able "to weather the financial storm" only because it

obtained sufficient "special work," which the big manufacturers did not want, to make a reasonable profit; (6) that beginning about 1936 petitioner began to market its products by selling them directly to the manufacturers who were to use them rather than through jobbers; (7) that except for the year 1938 petitioner's output in the number of pieces manufactured for the years 1936 to 1939 was normal; (8) that "the taxpayer's financial difficulties during the base calendar years 1936 to 1939 were not due to lack of sales, but to the price war that existed in the industry"; and (9) that the prices prevailing in the year 1934 were "normal" and that petitioner's average base period income for the years 1936 to 1939, inclusive, should be recomputed by applying the 1934 prices to the sales made in those years. A computation such as that proposed, based on 1934 prices, was submitted with the memorandum and showed reconstructed average yearly earnings for the base period years of $46,322.66.

The figures furnished by petitioner show that the first sharp decline in the average price of its products occurred in 1934, when it dropped from $12.20 per thousand in 1933 to $9.82 per thousand in 1934. In 1935 there was a further decline to $5.67. In 1936, the first base period year, it was $6.85; in 1937, $6.76; in 1938, $6.84; and in 1939, $5.59. Thus for a period of nine years, from 1934 to 1942, inclusive, the average price for all products was approximately $6.77 per thousand, while for the four base period years it was $6.51 per thousand, a difference of only 26 cents per thousand. The base period average price was larger than the average price for 1940, $5.47, and was only 14 cents below the average price for the taxable year 1941, when petitioner's profits on which the excess profits tax now complained of was levied amounted to approximately $21,000. For the years 1935 to 1942, inclusive, the average price of industrial bolts, which comprised most of the specials, was $8.63 per thousand, while for the base period it was $8.73 per thousand. Even in 1942 the allower average was only $7.26 per thousand.

These facts do not indicate that the prices which obtained during the base period were depressed because of temporary circumstances unusual in the case of the petitioner or the industry. They indicate rather that the prices of the base period were permanent, and reflected not only the strong competition which prevailed in the industry, but also the improvements in the methods of manufacture and the general progress of the industry. This conclusion is borne out by the testimony of petitioner's president that the price war in the industry obtained in years prior to 1936, but that 1936 was the worst year and that the business was always highly competitive, especially so after 1929, and also by the statement made in petitioner's claim that the industry was a highly competitive one and that the margin of profit was small.

The introduction of the boltmaker machine and of the drilling machine developed by petitioner were in no sense temporary circumstances. They marked permanent improvements in the methods of manufacture and contributed to the downward trend of prices.

Petitioner claims that it is entitled to relief under section 722 (b) (4) because of the changes which it made in the methods of operation and distribution and in the type of product.

The provisions of section 722 (b) (4), upon which petitioner relies, are those quoted above. Did the petitioner, in the language of the statute, either during or immediately prior to the base period, 1936 to 1939, inclusive, commence business or change the character of the business? It, of course, did not commence business. It completely changed the character of its business in 1929, when it changed from the manufacture of brake bands to the manufacture of cap screws, but that was long before the base period. The evidence is that prior to and during the base period petitioner was gradually increasing its production of "specials." Its production records show that until 1934 it manufactured nothing but hexhead cap screws and that in 1934 it began producing set screws flathead cap screws, stove bolts, and industrial bolts; that it produced approximately 670,000 industrial bolts in 1934, 3,370,000 in 1935, and 5,033,000 in 1936. In the meantime, however, there was no substantial decrease in the manufacture of cap screws, the 1933 and the 1936 production both being in excess of 4,000,000.

Even if the increase in the type or quantities of articles manufactured may be considered a change in the character of the business, as defined in the statute, such change took place in 1934 and not during or immediately prior to the base period.

It was in 1933 or 1934 that petitioner first began to solicit orders directly from the industries which were to use its products, whereas it had previously sold most of them through jobbers. That change came about gradually and extended into the base period years. Also, petitioner developed and began using the drilling machine in 1939. While one or the other, or both, of these circumstances may have constituted a change in the character of the business within the meaning of the statute, there is still the requirement under subsection (b) (4) that "the average base period net income does not reflect the normal operation for the entire base period of the business," as well as the general requirement common to all of the subsections under section 722 (b) that "the average base period net income.is an inadequate standard of normal earnings."

The average base period net income was $3,147.06. There was no great disparity in the net earnings of the base period years. They amounted to $4,103.64 in 1936, $3,450.48 in 1937, $1,983.42 in 1938, and

$3,050.68 in 1939. As pointed out above, the operations for the base period, as compared with those of both prior and subsequent years, were reasonably within the realm of normalcy, as established by the experience of the petitioner. There is no evidence before us as to the earnings of the industry as a whole. We think that the evidence fails to show that petitioner is entitled to relief under section 722 (b) (4).

As to petitioner's claim under subsection (b) (5), little needs to be said. That is a "catch-all" section intended to cover all other circumstances that may have adversely affected the base period net income. No facts were presented to the respondent in support of the petitioner's claim for relief under subsection (b) (5). The claim for relief under that subsection therefore is not properly before us. *Blum Folding Paper Box Co., supra.*

Reviewed by the Special Division.

*Decision will be entered for the respondent.*