7-UP FORT WORTH COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7360.   Promulgated January 17, 1947.

*S. G. Winstead, Esq.*, and *J. P. Jackson, Esq.*, for the petitioner.
*R. E. Maiden, Jr., Esq., Jacquin Bierman, Esq.*, and *Irene F. Scott, Esq.*, for the respondent.

**OPINION.**

Harlan, *Judge*: The question presented is whether petitioner is entitled to any relief from excess profits tax for the fiscal years ended April 30, 1942, and April 30, 1943, under the provisions of section 722 of the Internal Revenue Code,[2] as amended, and if so, the amount thereof.

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) General Rule.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in the cases described in the last sentence of section 722 (b) (4) and in

Although the petitioner's assignment of error in its petition indicates it is seeking relief under the provisions of subsections (b) (2), (4) and (5), of section 722, no facts were stated to the respondent in its claim for relief under subsections (b) (2) and (5). Its claim for relief under these subsections is, therefore, not properly before us. *Blum Folding Paper Box Co.*, 4 T. C. 795; *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220. This leaves for our consideration whether petitioner has established the existence of the factors mentioned in subsection (4) of section 722 (b). Petitioner's claim before the respondent was specifically grounded upon section 722 (b) (4) and on brief it states that its claim in the instant proceeding is based primarily upon this section.

Section 722 (a), *supra*, requires that petitioner establish that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax and what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. If petitioner satisfies these two requirements, then the statute provides that the tax shall be determined by using such constructive average base period net income in lieu of

---

section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, \* \* \* shall be deemed to be a change on December 31, 1939, in the character of the business \* \* \*

(5) of any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period and the application of this section to the taxpayer would not be inconsistent with the principles underlying the provisions of this subsection, and with the conditions and limitations enumerated therein.

the actual average base period net income otherwise determined under the statute.

The factors upon which petitioner bases its claim for relief under section 722 (b) (4), *supra*, are (1) that it commenced business after the beginning of and during the base period, and (2) that it changed the character of its business by making a change in its operation and management and by adding a new product, the Nesbitt orange drink.

Petitioner commenced business on May 14, 1937, during the base period. During the fiscal year ended April 30, 1938, the first year of its existence, it suffered from mismanagement. During that year it was under the management of J. R. Payne, who was also its president. Prior to coming to petitioner, Payne had had extensive experience with other 7-Up companies in Texas. Through the medium of what appears to have been an unjustified and lavish expenditure of petitioner's funds for advertising, sales personnel, and sales promotion methods, he produced a large sales volume, but in doing so he incurred a large indebtedness, and the result of the first year's operation was a net loss of $1,060.15.

The stockholders and directors of petitioner, and especially Kloppe, who, in addition to being an officer, was the principal stockholder, conducted an investigation and decided to make a change in management. They were primarily interested in profits. Payne resigned on August 1, 1938, and Kloppe took charge and appointed a new manager in whom he had confidence. The new management accomplished many economies in the operation of the business, materially reduced advertising expenditures, and cut and replaced sales personnel. Although sales of 7-Up were 26,000 cases less than those of the preceding year, the company made a profit of $1,722.77. During the fiscal year ended April 30, 1940, the first full year's operation under the new management, a net profit of $9,906.24 was realized, despite a further decline in case sales of approximately 7,000 cases. Nesbitt orange drink, a beverage which petitioner acquired the right to bottle and sell in December of 1939, and started to sell in February 1940, was responsible for an insignificant portion of this profit, as only 1,644 cases of this drink were sold during the months of February, March, and April, 1940.

Subsection (4) of section 722 (b), *supra*, provides that a change in the character of the business includes, among other things, a change in its operation or management and a difference in the products furnished. The evidence clearly proves that petitioner made these changes, and the respondent does not dispute the fact that petitioner commenced business during the base period. The respondent urges that these facts are not sufficient *per se* to entitled petitioner to relief

under section 722 (b) (4) ; and that, even assuming the occurrence of these factors brought about an inadequacy in one or more of the four base period years, which he does not admit, petitioner would not necessarily be entitled to relief, since such inadequacy may have been fully compensated for by the use of the growth formula under section 713 (f). In other words, the respondent takes the position that the upward adjustment under the growth formula may give rise to an average base period net income which is equal to or better than a constructive average base period net income which does reflect normal operations of the new or changed business for the entire base period.

As shown by our findings, the mathematical average of petitioner's net income for its four base period years is $4,404.68. Since it did not have a full statutory base period, it was entitled, under subsection (d) (2) of section 713, to use for the missing period a net income based on 8 per cent of its invested capital on the first day of its first excess profits tax year. Petitioner thus received a net income for the missing period—the fiscal year ended April 30, 1937—of $5,989.71. This, when averaged with its actual net income for the remaining base period years, results in a four-year average of a little over $4,000. However, since petitioner's earnings for the last two years exceeded its earnings for the first two years, it was entitled to the benefits of the "growth formula" provided by subsection (f) of section 713, with the result that it received an actual average base period net income for excess profits tax purposes of $7,519.33, instead of the simple four-year average.

In order to be entitled to relief under the provisions of section 722, petitioner must establish what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income and that its average base period net income, $7,519.33 (computed without the benefit of section 722), is an inadequate standard of normal earnings. In other words, it must show that the fair and just reconstruction of normal earnings under section 722 exceeds the average base period net income as otherwise determined under the statute. Petitioner claims that its "constructive average base period net income" is $36,300.35. At the trial it had three witnesses testify in support of its claim.

The first witness, Howard E. Ridgeway, is the vice president of the 7-Up company in St. Louis, which produces the syrup from which the 7-Up beverage is made. Petitioner attempted to prove through this witness the experience of comparable companies and the experience of the industry as a whole to show what its normal growth would have been if it had commenced business at the beginning of the base period and not been mismanaged. The witness testified that during the base

period years 7-Up bottlers generally showed substantial increases in sales; that the rate of those increases depended largely upon the time they commenced business; that if they started as early as 1933 or 1934, the rate of increase for the most part was not as great as it was during the second and third years; that usually they had a substantial growth in the second and third years, and from there on the rate of growth decreased; and that companies commencing business in 1936 and 1937 followed the same pattern of growth as those which started in 1933 or 1934. The witness also testified that all 7-Up companies did not grow in the same way during the base period years, and some showed decreases in sales. Through this witness the petitioner sought to introduce in evidence a table showing the growth of twelve 7-Up companies which the witness thought were comparable to petitioner. This table was not admitted in evidence, on the ground that the twelve companies, scattered over the United States and outside of the State of Texas, where conditions were different, did not provide a useful basis of comparison. The witness testified that in 1936 the average normal manufacturing plant cost of a case of 7-Up was 12 cents per case; the normal advertising expense 5 cents per case; the normal administration expense 5 cents per case; and that these figures would not vary substantially for any of the years 1937, 1938, and 1939.

Another witness, Clarence B. Kloppe, executive vice president of petitioner, testified that when the change in management was effected on August 1, 1938, new salesmen were employed and this retarded development, inasmuch as it took from 4 to 6 weeks to train a new salesman on a route; that the company was not in a position when he took over to increase volume; that he was interested in cutting expenses; and that he had the creditors paid off by the end of the fiscal year ended April 30, 1940, and then was in a position to give some attention to trying to increase volume and expand. He expressed the opinion that if petitioner had been organized 2 years prior to 1937, and assuming proper management to the end of the base period, the volume of sales at that time would have been at least 250,000 cases. He based this opinion on the territory served, its population of 400,000, and the fact that the capacity of the plant was 500,000 cases a year. He also expressed the opinion that, if the change in management had occurred 2 years prior to 1938, the volume reached by the end of the base period would have been 200,000 cases. He testified further that, in his opinion, if petitioner had received the Nesbitt franchise and begun bottling the Nesbitt orange drink 2 years prior to February 1940, it would have attained a volume of at least 25,000 cases a year by the end of the base period. In arriving at this estimate, he stated that he took into consideration the popularity of the drink in other parts of the country

where it had been bottled; the standing record of the Nesbitt Co. for producing the finest orange drink in the country; the volume reached by other bottlers who had started in prior years, according to the size of the territory they were serving; and the capacity of petitioner's plant.

Kloppe and D. R. Bonner, a certified public accountant who also testified as a witness for petitioner, collaborated in preparing the claim for relief in this proceeding. In this connection they also reconstructed petitioner's excess profits net income for the base period years and determined that its reconstructed average excess profits net income for those years was $36,300.35. They determined that the gross income for each year would be $153,536.96, based on estimated sales of 169,854 cases of 7-Up and 22,500 cases of Nesbitt orange drink. They also reconstructed cost of sales and operating, delivery, and administrative expenses, to conform to this sales volume. Two sheets showing the reconstruction favored by the petitioner were introduced in evidence over the objection of the respondent's counsel, who contended, with some justification, that the reconstruction in numerous specific instances was based on events and circumstances occurring subsequent to December 31, 1939, to some extent on petitioner's post-1939 experiences, and upon inferences and conclusions drawn from alleged facts and circumstances not proved in evidence. The admission of petitioner's proposed reconstruction in evidence does not bind this tribunal to give effect to any part of such reconstruction which conflicts with the provision of section 722 (a) that "no regard shall be had to events or conditions generally occurring or existing after December 31, 1939," or which is based upon facts not proved and this has not been done.

We first consider petitioner's claim that it is entitled to a reconstructed sales volume for 7-Up during each of the base period years of 169,854 cases. Its actual sales from May 14, 1937, to April 30, 1938, the period of its first fiscal year during which it was in existence, amounted to 162,664 cases, and a reasonable approximation of what it would have sold had it been in existence during the remainder of the fiscal year, May 1 to May 14, 1937, computed as shown in our findings, is 7,190. By adding these two figures, petitioner arrives at total sales for the first fiscal year of 169,854 cases. It used this figure for all of the base period years because, according to the testimony of Kloppe, he felt that at least this volume could have been obtained by the end of the base period if the corporation had commenced business at the beginning of the base period and had not suffered from mismanagement and been required to change its management. He testified he based this estimate on the size of the territory, its population of 400,000,

plant capacity of 500,000 cases, sale of 169,000 cases during the first fiscal year under bad management, the parent company's figures showing 7-Up sales all over the United States, and statistics gathered by certified public accountants for the American Bottlers and Carbonated Beverage Association covering the experience of companies engaged in the bottling and sale of beverages other than 7-Up. Neither the figures compiled by the parent company nor the statistics gathered by the certified public accountants are in evidence.

There is nothing in the record to support Kloppe's opinion that the volume of 169,854 cases of 7–Up could have been reached by the end of the base years, or that this figure represents a fair and reasonable volume for petitioner for each of the base period years, assuming that it had been in business during the entire base period. This tribunal has heretofore stated that "the establishment of an ultimate fact requires something more than a mere statement of the conclusion of the fact sought to be proved." *Arden-Rayshine Co.*, 43 B. T. A. 314, 320.

The petitioner urges that we adopt as its reconstructed volume of sales for each base period year a volume which was reached by the old management under methods which the new management did not approve and did not follow. The old management was lavish in its expenditures of money in order to achieve volume. The new management practiced economies, especially in advertising and sales methods, and the result was reduced sales volume. Despite this obvious fact, the petitioner urges that, had the new management been in control during all of the base period years, it would have reached the same, or a greater, volume by the end of the base period than the old management achieved through entirely different methods in the first year of operation. This has not been proved.

As we analyze the evidence, the first year of operation under the old management must be treated as an abnormal year, in which earnings were sacrificed for volume. The second year, 3 months of which were under the old management and 9 under the new management, must also be treated as a year in which petitioner did not reach its normal level of earnings or volume, as petitioner undoubtedly derived some benefit from the repudiated methods of the old management, as far as volume was concerned, and some benefit from the changes adopted by the new management in the form of decreased expenditures. The last base period year seems to us to be the best criterion of what might be expected from the new management. At the beginning of that period it had been in control of petitioner's business for a period of 9 months, had had the opportunity to train its new sales per-

sonnel, which, according to Kloppe, took from 3 to 4 weeks, and by reason of the economies which it advocated and practiced, had converted the business into a profitable enterprise. During this year the petitioner sold 127,756 cases of 7-Up and realized a net profit of $9,906.24. Had it been on the basis of a calendar year ended December 31, 1939, its net profit from sales of 7-Up would have been substantially the same as during the months of January to April, 1939, inclusive, when its receipts from sales amounted to $25,397.90 as compared with receipts of $26,537.18 for the first 4 months of 1940. The difference of about $1,200 represents the approximate receipts from 1,644 cases of orange drink sold by petitioner from February to April, 1940, inclusive.

7-Up was not first introduced into the Fort Worth territory when petitioner commenced business in 1937. Prior to that time its predecessor, the Milwaukee Bottling Co. had bottled and sold this beverage. How long the latter company had been so engaged, and the amount of its sales, are not disclosed. However, the fact that it initiated the sale of 7-Up in the Fort Worth territory justifies the assumption that if petitioner had been in existence during the entire base period under the new management its sales volume in the first year would not have differed materially from the volume in other base period years. We do not think that the unsupported testimony of Ridgeway that the total sales of 7-Up companies increased progressively from 1936 to 1939 is any sound basis for a conclusion that petitioner, under the new management, would have had an upward trend in its sales. He admitted that some 7-Up companies showed decreases in sales, and there is no evidence showing that other bottlers of 7-Up in Texas who were comparable with petitioner experienced increases in their sales volume during the base period years. Neither do we think that the fact that petitioner and the 7-Up Dallas Co. under the old and new managements experienced a downward trend in sales is a sound basis for concluding that petitioner under the new management would have a similar downward trend. Ridgeway testified that the year 1937 was an excellent year for bottlers of 7-Up and that they did not experience in 1938 the general recession of business which affected other industries. As heretofore stated, in its first full year of operation under the new management, the fiscal year ended April 30, 1940, petitioner had a sales volume of 127,756 cases of 7-Up. Petitioner has not proved to our satisfaction that it would have exceeded this volume by the end of the base period had it commenced business at the beginning of the period under the new management. Petitioner has established that the new management attained this volume at the end of the base period, even without the application of the "push-

back" rule. In the absence of any convincing evidence that the application of this rule would produce a greater sales volume, we think the only reasonable conclusion is that 127,756 cases represents the normal volume of 7-Up that petitioner, under the new management, would have sold during the base period years had it been in existence during the entire base period.

We next consider the Nesbitt orange drink and what effect, if any, should be given to the acquisition of the right to bottle and sell this beverage in the reconstruction of petitioner's base period net income. The petitioner contends that it could have sold an average of 22,500 cases of Nesbitt orange drink if it had had the franchise to sell this beverage during the base period years and that this should be taken into consideration in reconstructing its base period net income. The respondent urges that petitioner's contention should not be considered, since no competent factual basis for a reconstruction was furnished to him prior to the disallowance of the claim, citing *Blum Folding Paper Box Co.*, 4 T. C. 795. In the cited case this tribunal held that, where the Commissioner, after giving the taxpayer ample opportunity to amend, disallowed an application for relief for the reason that it gave him practically no information of the possible factual support for the claim, a statement of supporting facts thereafter offered by the taxpayer is not a part of the claim, and consideration of it is beyond the scope of review by this Court.

The facts of the instant proceeding do not warrant the application of the principle laid down in *Blum Folding Paper Box Co., supra*. The factual basis which petitioner alleged to this tribunal with reference to the Nesbitt orange drink is substantially the same as that stated in its claim for relief to the respondent. In both instances the facts disclose the acquisition of the right to produce, promote, and sell this beverage on December 19, 1939; the popularity of the drink in other parts of the country where it had been previously bottled and sold; the sale of 1,644 cases during low consumption months of February, March, and April, 1940; failure of petitioner to reach its normal level of earnings with respect to this beverage by the end of its base period, April 30, 1940, the fact that the plant had the bottling capacity to absorb any reasonable increase resulting from the acquisition of the orange drink franchise; and the opinion of its principal officer, Kloppe, that it would have attained by the end of its base period a volume of at least 25,000 cases of Nesbitt orange drink a year if it had acquired the franchise and begun bottling this drink two years prior to the end of the base period. The books of petitioner reveal that its case sales of Nesbitt orange drink amounted to 15,511,

25,815, and 37,934 during the fiscal years ended 1941, 1942, and 1943, respectively, and that the sales of 7-Up during these years were 114,552, 159,099, and 172,258 cases. According to Kloppe, the material, operating, and other costs in connection with the manufacture of Nesbitt orange drink are substantially the same as those for 7-Up, which are in evidence, and these costs were used in petitioner's proposed reconstruction filed as a part of its claim for relief.

Despite this evidence, the respondent insists that the record is bare of any evidence of whether the petitioner could have sold any of the orange drink in the base period, with the exception of the opinion of Kloppe, which is, according to the respondent, unsupported. Respondent also urges that, even if there were evidence of the quantities which could have been sold, it would be useless because Kloppe's opinion as to the costs of bottling Nesbitt orange drink is based on post-1939 experience, since the petitioner did not bottle this beverage until after January 1, 1940.

We do not agree with the respondent. While the evidence is not as comprehensive as it might be, we think it does show that petitioner, which bottled and sold over 100,000 cases of one beverage during each of the base period years during which it was in existence, which had the capacity to bottle approximately 5 times that amount, and which was serving a territory with a population of 400,000, could have sold a substantial amount of another popular beverage by the end of the base period if it had acquired the franchise to bottle and sell it 2 years prior to the end of the period. After a careful consideration of all the evidence we have, therefore, found as a fact that, if petitioner, under the new management, had acquired the right to bottle and sell Nesbitt orange drink 2 years prior to the end of its base period, its sales of this beverage at the end of the base period would have reached a volume of 20,730 cases per year.

The selling price and costs of producing and selling 7-Up during the base period years are shown in our findings, and Kloppe testified that the selling prices and costs of producing and selling Nesbitt orange drink are substantially the same. It is true that Kloppe's testimony is based on post-1939 experience with Nesbitt orange drink, inasmuch as petitioner did not bottle and sell this beverage until February 1940. Such testimony may, however, properly be considered under the exception contained in the last sentence of section 722 (a), *supra*. Moreover, we think it is quite reasonable in view of the fact that both beverages sell for the same price per case and are bottled in the same plant and sold and delivered by the same personnel.

Our best judgment is that the evidence justifies the following reconstruction of petitioner's net income for each of the base period years:

| | | |
|---|---:|---:|
| Gross receipts from sales of 7-Up and Nesbitt orange drink | | $118,521.53 |
| Other income | | 207.55 |
| | | 118,729.08 |
| Cost of sales | $41,412.75 | |
| Operating, delivery, and administrative expenses | 65,036.87 | |
| Other expenses | 125.55 | |
| | | 106,575.17 |
| Reconstructed average base period net income | | 12,153.91 |

In using the same figures for each of the base period years, we have not overlooked the fact that a corporation's normal earnings at the end of its base period are not always indicative of its normal earnings for the entire base period, and that, where they are not, adjustments should be made. See *East Texas Motor Freight Lines*, 7 T. C. 579, 595. We have deemed no adjustment necessary in the instant proceeding because we are satisfied from the evidence that petitioner's cost of sales and other expenses and the demand for its products would have been substantially the same during its entire base period if it had operated under the new management and sold both 7-Up and Orange drink. The beverage business, as one of petitioner's witnesses testified, "is a nickel business and people can find a nickel in 32 as well as in 45 * * *," and it does not vary perceptibly with an increase or decrease in consumer's income.

It follows from the foregoing that our conclusion is that the average base period net income computed without the benefit of section 722 does not reflect the normal earnings of the petitioner for the base period; that petitioner's proposed reconstructed average base period net income of $36,300.35 is too high; that the "fair and just amount representing normal earnings to be used as a constructive average base period net income" is $12,153.91; and that this amount should be used in lieu of the average base period net income, determined without the benefit of section 722, in computing petitioner's excess profits liability for the fiscal years ended April 30, 1942 and 1943.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*