OPINION. Ttson, Judge: In this proceeding the parties have settled by stipulation all assignments of error with respect to petitioner’s income tax liability for each of the years 1940 and 1941; and, further, with respect to petitioner’s excess profits tax liability for the calendar year 1941, they have stipulated the fair and just amounts representing petitioner’s normal earnings from its compressed baker’s yeast business for each of the base period years 1936-1939, inclusive, after application of section. 722 of the Internal Revenue Code. The first issue presented for our determination is whether, with respect to petitioner’s business of brewing and selling beer, respondent erred in his denial of petitioner’s claim for relief from excess profits tax for the year 1941, under the provisions of section 722 (a), (b) (2), or (b) (4) of the Internal Revenue Code, as amended, the material portions of which are set out in the margin.[1] Section 722 provides for relief, in a meritorious case, from excessive and discriminatory excess profits taxes occasioned by an abnormally low excess profits credit, and the relief is afforded through establishing a fair constructive average base period net income to be used in lieu of the average base period net income otherwise determined under the statute, with a consequent increase in the excess profits credit. Monarch Cap Screw & Mfg. Co., 5 T. C. 1220, 1227. In the instant case there is no .question raised as to the petitioner’s being entitled to use the excess profits credit based on income. The petitioner’s actual average base period excess profits net income amounted to $602,-775 and in his determination respondent granted petitioner a measure of relief by computing its average base period excess profits net income to be in the amount of $674,844 under the so-called growth formula, pursuant to section 713 (f), and petitioner does not challenge the correctness of that computation, except that it claims a far greater relief, under section 722, by use of a constructive average base period net income in the amount of $1,159,196 for its beer business alone and in the total amount of $1,209,782 for its entire business, based on amounts which petitioner claims should be regarded as representing its normal earnings for the base period years. Under subsection (a) of section 722 petitioner must establish (1) that its excess profits tax computed without the benefit of that section results in “an excessive and discriminatory tax,” and (2) “what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income.” Further, where the tax is computed without benefit of section 722 and the taxpayer is entitled to use the excess profits credit based on income, as in the instant case, then under subsection (b) of section 722 the petitioner’s excess profits tax “shall be considered to be excessive and discriminatory * * * if its average base period net income is an inadequate standard of normal' earnings,” because of the existence, in the instant case, of such qualifying conditions as are set forth in subparagraphs (2) .and (4) of subsection (b). See cases cited in margin.[2] Petitioner claims that its base period net income is an inadequate standard of normal earnings because of the existence of several qualifying conditions: First, that within the meaning of subsection (b) (2) the brewing industry of which it was a member (and coincidentally the business of petitioner) was “depressed” during the base period years “by reason of temporary economic events unusual in the case of such industry,” namely, national prohibition, or more specifically, the peacetime prohibition of the manufacture and sale of beer under the definition of the term “intoxicating liquors” made by Congress in the Volstead Act; second, that within the meaning of subsection (b) (4) the petitioner immediately prior to and during the base period “changed the character” of its business, with the result that its “average base period net income does not reflect the normal operation for the entire base period” of its beer business, the change consisting of the commencing of the manufacture and sale of beer in April, 1933, coupled with a subsequent change from the sale mainly of draught beer to the sale mainly of packaged (bottled and canned) beer; and, third, that its beer business “did not reach, by the end of the base period, the éarning level which it would have reached” if it had manufactured beer and changed from sales of draught to packaged beer “two years before it did so” because sale of its packaged beer was on a continuous upgrade and was more profitable than draught beer measured by barrel sales. Furthermore, on the basis of allegedly having qualified under subparagraphs (2) and/or (4) of subsection (b) so that its tax “shall be considered to be excessive and discriminatory,” petitioner claims that, as required by subsection (a), it has established “what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax.” Respondent, in denying petitioner’s section 722 application for relief and in the present proceeding, takes an opposing position to that of petitioner on all points. First, with respect to the claimed existence of a qualifying condition under subsection (b) (2), respondent contends that national prohibition of beer under the Eighteenth Amendment and the Volstead Act was not an unusual temporary economic event within the meaning of the taxing statute and that neither the brewing industry nor the petitioner’s beer' business was depressed, but instead attained a post-prohibition normalcy during the base period years. Second, with respect to the claimed existence of qualifying conditions under subsection (b) (4), respondent contends that petitioner could not have started the manufacture and sale of beer prior to the time it actually did so; that petitioner’s shift from sales mainly of draught to mainly of packaged beer as a method of marketing its product was not a change in the character of the business as envisaged by the statute; and, further, that, in supplying consumer demand as it existed during 1936-1939 and within the limits of its production capacity and competition, petitioner’s beer business had reached, by the end of the base period, the earning level which it would have reached had it undertaken the change to sale of packaged beer two years before it did so. Respondent also contends that petitioner’s average base period excess profits net income from its beer business, computed under the growth formula of section 713 (f), as was done here by respondent, constitutes an adequate standard of normal earnings and, further, that in any event petitioner’s claimed constructive average base period net income in the amount of $1,159,196 for its beer business is not based upon what would be a fair and just amount representing normal earnings during the base period years. We first consider the question of whether the petitioner qualifies under the specifications of subsection (b) (2) of section 722; that is, whether petitioner’s average base period net income is an inadequate standard of normal earnings because the brewing industry of which petitioner was a member, and coincidentally the brewing business of petitioner, “was depressed by reason of temporary economic events unusual in the case of such industry.” Assuming for purposes of discussion that the business of the industry and petitioner was depressed in the base period, we shall consider the petitioner’s first contention, that the adoption of the Eighteenth Amendment and more particularly the enactment of the Volstead Act in January, 1920, providing for national prohibition of the manufacture and sale of beer, was such an event as came within the purview of the statute. In our opinion it was not. The Eighteenth Amendment was an act of the people through proper channels resulting in a drastic change in their fundamental national charter of government, namely, their Constitution, which change as of the time of its adoption was to last for an indeterminate period and was not, in our opinion, temporary within the meaning of that word as used in the statute. Likewise, the enactment of the Volstead Act as the enforcement law, carrying the definition of what constituted intoxicating liquor, was an act of the people through their representatives in Congress and the Executive, which, although subject to change as is any legislation, was also, to last for an indeterminate period and was therefore in our opinion not temporary within the meaning of the statute. The facts that thirteen years later the definition of intoxicating liquor was modified to permit the manufacture and sale of beer under the Cullen-Harrison Act of April, 1933, and that the Eighteenth Amendment was repealed by ratification of the Twenty-first Amendment in December, 1933, do not have the effect of retroactively or otherwise characterizing national prohibition or more particularly the Volstead Act as a temporary event within the meaning of section 722 (b) (2). Also, we think that ratification of the Eighteenth Amendment and enactment of its enforcement law, whether or not a temporary event, was strictly a legislative event, and in and of itself did not constitute an economic event within the meaning of section 722 (b) (2), notwithstanding economic consequences resulted therefrom in that the effect of such legislative event was to put an end to the legal beer-brewing industry for a period of years lasting until subsequent legislative events in 1933. terminated national prohibition of beer. The facts show percentages of all wage earners, all wages paid, value of products, value added by manufacturers in the beer and still beverage industries as related to similar items in all manufacturing industries in the United States and California in various years, and also the acreage in the United States in agricultural products used in the brewing industry, barley consumed in that industry, and percentages of barley so consumed to total barley consumption in all industries in various years before and after prohibition. If the petitioner is in reality, as seems to be the case, attempting to show by those facts that the economic consequences resulting from the legislative event of national prohibition constituted an economic event as contemplated by the statute, our conclusion is that it did not, since the cause (the legislative event), not being temporary, the consequences were likewise not temporary. With regard to whether the event or consequences were “unusual,” within the meaning of that term as used in section 722 (b) (2), it is clear that, while peacetime prohibition on a national scale was unusual in that it was the first time in the history of this country that it was imposed, nevertheless the record discloses that prohibition in and of itself was not such an unusual event that its probable occurrence would not be anticipated in the normal experience of the brewing industry as a whole and in such experience of a member of the industry. That industry had been faced with ever increasing peacetime state prohibition over a period of years (from 2 states in 1904 to 19 states in 1917) prior to the World War I restrictions; it had been faced with wartime restrictions beginning with the limitations on production effective January 1, 1918, and culminating in the War Prohibition Act effective from July 1, 1919, until conclusion of the war and thereafter until the termination of demobilization, which act prohibited the sale, except for export, of beverages containing one-half of 1 per cent or more of alcohol by volume; and it had been faced in 1919 with the fact that 30 states had statewide prohibition and in 1920 with the fact that 32 states had statewide prohibition. The facts adduced in this proceeding lead us to the conclusion that neither the legislative event of national prohibition in January, 1920, nor the resulting economic consequences constituted a temporary economic event unusual in the brewing industry or the business of petitioner, within the meaning of section 722 (b) (2). At the outset of the foregoing discussion and for the purposes thereof, we assumed that the brewing industry and the business of petitioner were depressed in the base period years. However, in our opinion the record establishes that such a “depressed” condition as is contemplated by section 722 (b) (2) did not exist. Briefly stated, petitioner contends that a depressed condition of the brewing industry is shown by a comparison of the actual base period average per capita of barrel consumption of 12.7 gallons in the United States and 11.8 gallons in California with an estimate of what that consumption would have been in the base period years absent the existence of the period of national prohibition, namely, 19.2 gallons in the United States and 17.8 gallons in California. Such estimated reconstructed beer consumption during the base period years was testified to by expert witnesses who {first) arrived at the estimated 19.2 gallons per capita in the United States based upon their consideration and analyses of economic and statistical data including, inter alia, figures on population, trends in beer consumption per capita, beer consumption in relation to consumer income, the price of beer, and reference to the average annual per capita beer consumption of 20.2 gallons in the United States during the five years 1909-1913 as a normal period, and (second) arrived at the estimate of 17.8 gallons per capita in California based upon their consideration of somewhat similar data pertaining to California during the base period years in relation to the estimated United States consumption. Both the actual and the estimated reconstructed beer consumption for California during 1936-1939 are approximately 93 per cent of tbe similar figures for tbe United States. Petitioner then takes a percentage of tbe estimated California consumption as representing petitioner’s reconstructed gross barrelage sales in California plus its actual out-of-state sales of beer to show that its brewing business, as well as tbe industry, was depressed. We have given careful consideration to tbe voluminous evidence and testimony of record and conclude that it shows that neither tbe brewing industry nor tbe brewing business of petitioner was depressed during tbe base period. In our opinion the five-year period of 1909-1913 selected by petitioner as representing a comparative period of normalcy in consumption of beer is not sound, for it is too remote from and disconnected with tbe base period years 1936-1939, not only with respect to the element of time, but also with respect to the wholly dissimilar conditions and circumstances obtaining in those two periods. We may not brush aside actual events of the intervening years 1914-1933 as if they never occurred and thus disregard the results thereof. Prior to national prohibition and between 1914 and .1920 an ever increasing number of states adopted state prohibition. The advent of national prohibition in 1920 put an end to the brewing industry. The enactment of the Cullen-Harrison Act in April, 1933, and the subsequent repeal of the Eighteenth Amendment in December of that year resuscitated the long dormant brewing industry for the production and sale of beer. Thereafter, the business of the industry and of petitioner was no longer limited by law, but only by the capacity of production and the consumer demand during the post-prohibition period 1933 to 1939. In the latter era the United States average per capita consumption reached a peak of 13.4 gallons in 1937 and leveled off to 12.2 gallons in 1938 and 12.5 gallons in 1939, and the California average per capita consumption reached a peak of 12.4 gallons in 1937 and leveled off to 11.3 gallons in 1938 and 11.4 gallons in 1939, thus clearly establishing a post-prohibition condition of normalcy rather than a depressed condition in both the United States and California, and in the case of both the brewing industry and the petitioner. In our opinion the record herein fails to establish that the petitioner’s average base period net income is an inadequate standard of normal earnings because of the condition prescribed in section 722 (by (2). We next consider the question raised by petitioner’s second contention, of whether the petitioner’s average base period net income is an inadequate standard of normal earnings because, within the meaning of subsection (b) (4), petitioner “either during or immediately prior to the base period, * * * changed the character of the business” and as a result thereof its average base period net income “does not reflect tbe normal.operation” of the business for the entire base period. From July 1,1921, until April 7,1933, petitioner produced and sold bottled near beer and soda beverages, malt syrup, and baker’s yeast, and on the latter date it commenced to engage mainly in the production and sale of fermented malt liquors (beer) in kegs and packaged, which constituted a major difference in petitioner’s products and thus a change in the character of its business, Lamar Creamery Co., supra. However, such change in 1933 was not “immediately prior to the base period” within the meaning of subsection (b) (4), see Monarch Cap Screw & Mfg. Co., supra, p. 1231,[3] and accordingly, in our opinion, the petitioner’s engaging in the beer business at the time it did so was not such a change as was contemplated by the statute for the purposes of the special relief therein provided. Petitioner further contends that, in addition to the 1933 change to the beer brewing business and coupled therewith, it also made a change in the character of its business both prior to and during the base period, in that it adopted in 1933 and carried out during the intervening years to 1939 a plan to engage primarily in the sale of packaged (bottled and canned) beer. That plan consisted of an intense continuous advertising program and, due to it and the demand of the trade, petitioner’s sales of packaged beer steadily increased from 25 per cent of total sales in 1933 to 80 per cent in 1939. Before results were obtained from the advertising program petitioner was already engaged in the production and sale of packaged beer in 1933, and through advertising it merely promoted an increase in the volume of its packaged beer business. We conclude that there was no such change as envisaged by subsection (b) (4), supra, for there was no departure from the general character of the petitioner’s beer business. Stonhard Co., supra. Furthermore, the record shows that petitioner had the same brewing plant and bottling facilities throughout the period 1933-1939; that petitioner gradually made greater use of its bottling facilities in accordance with consumer demand and competition; and that for each of the base period years the petitioner’s percentage of packaged sales to its total sales was less than the similar percentage of sales by all California breweries as indicated by tax-paid withdrawals by those breweries. Accordingly, we further conclude that petitioner’s increased sales of packaged beer during the base period years resulted directly from the existing conditions in the California trade as a whole, including consumer demand and competition, and not from any particular change in the character of the business of petitioner. Cf. Harlan Bourbon & Wine Co., supra. Having decided that there was no change in the character of the business within the meaning of subsection (b) (4), the petitioner’s third contention, i. e., as to the so-called two year rule, need not be considered. In our opinion petitioner has failed to establish that its average base period net income is an inadequate standard of normal earnings because of any of the conditions prescribed in subsection (b) (4). Inasmuch as petitioner has failed to establish that its average base period net income is an inadequate standard of normal earnings because of any of the factors embraced in subsections (b) (2) and (4), it is not necessary to discuss the voluminous facts and expert opinions as to “what would be a fair and just amount representing normal earnings” of petitioner’s beer business “to be used as a constructive average-base period net income for the purposes of an excess profits tax,” under section 722 (a). Respondent is sustained in denying petitioner the claimed relief under section 722 in regard to its beer business and in computing petitioner’s average base period net income as to that business under the growth formula of section 713 (f). The petitioner’s excess profits credit carry-over from 1940 to 1941 as allowed by respondent is based, inter alia, upon an average base period net income determined under the growth formula, and there is no proof of error with respect thereto except in so far as the adjustments herein stipulated by the parties may properly affect such carry-over. Reviewed by the Special Division. Decision will be entered imder Bule 50. SEC. 722. GENERAL RELIEF— CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME. (a) General Rule. — In any case in -which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subcbapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939 * * *. (b) Taxpayers Using Average Earnings Method. — The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because— ******* (2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry, * * * * * * * (4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term “change in the character of the business” includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. * * * Monarch Cap Screw & Mfg. Co., supra; Mast Texas Motor Freight Lines, 1 T. C. 579; 7-Up Fort Worth Co., 8 T. C. 52; Fish Net & Twine Co., 8 T. C. 96; Lamar Creamery Co., 8 T. C. 928; National Grinding Wheel Co., 8 T. C. 1278; Irwin B. Schwabe Co., 12 T. C. 606; El Campo Rice Milling Co., 13 T. C. 775; Stonhard Co., 13 T. C. 790; and Harlan Bourbon & Wine Co., 14 T. C. 97. Wherein it was held that a change In 1934 was not within the time prescribed by the statute.