## George Moser Leather Company, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 29249.   Filed January 26, 1959.

*J. Bernard Brown, Esq.*, for the petitioner.
*Donald W. Geerhart, Esq.*, for the respondent.

OPINION.

VAN FOSSAN, *Judge:* The petitioner's claims for relief are predicated upon two grounds: First, that the normal production, output, and operation of the petitioner were interrupted during the base period by the Ohio River flood of January 1937, an event unusual and peculiar in the experience of the petitioner; and second, that the business and earnings of the petitioner and of the industry of which it was a member during the base period years were adversely affected by an unprecedented drought in the United States during the year 1934, an event temporary and unusual in the experience of petitioner or its industry.

These claims were formulated under Code section 722(b)(1) and (b)(2).[2]

To be entitled to relief under section 722(b)(1) it is incumbent upon petitioner to show that its average base period net income is an inadequate standard of normal earnings because "in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer."

Respondent concedes that the Ohio River flood of 1937 was an event such as described in subsection 722(b)(1), but denies that petitioner's average base period net income is an inadequate standard of normal earnings by reason thereof. If the entire amount claimed by petitioner as flood loss ($6,584.58 stipulated identifiable expenses, plus $11,107.93 reconstructed lost profits) were restored to income for

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

(2), the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

1937, the excess profits credit computed upon the average base period net income as so reconstructed would not equal the credits available to petitioner under the invested capital method. Hence, it has not been shown that petitioner's taxes were unjust and discriminatory because of the flood. *Avey Drilling Machine Co.*, 16 T.C. 1281 (1951).

Respondent correctly denied petitioner's claims for relief under section 722(b)(1).

It is axiomatic that for a taxpayer to be entitled to relief under section 722(b)(2) its business must have been depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry. *Monarch Cap Screw & Manufacturing Co.*, 5 T.C. 1220 (1945).

Petitioner's argument rests basically on the severe drought of 1934 with the consequent economic dislocation. It points to the glut of hides which flooded the market; the intervention of the Government and its large purchases of cattle; and the reduction in the purchasing power of the farmer, which factors resulted, so petitioner contends, in the narrowing of the margin of profit between the cost of raw materials and the selling price of finished leather. On the record before us we cannot agree either with petitioner's factual premise or the conclusion it asks us to draw.

Assuming, *arguendo*, that its business in the base period was depressed, petitioner must still connect the events relied upon for relief with its own net income for the base period years. *Hougland Packing Co.*, 28 T.C. 519 (1957). This cannot be assumed. *A. B. Frank Co.*, 19 T.C. 174 (1952), affd. 211 F. 2d 497 (C.A. 5, 1954).

Careful scrutiny of the evidence before us reveals that, excepting a stabilization or mild decline in 1934, the year of the drought, hide prices increased steadily from 1932 through 1937. The evidence further shows that while price margins between hides and sole leather shrank in 1934, and margins between hides and harness leather contracted in 1935, margins between hides and both sole and harness leather had increased substantially by 1937 and, with the exception of the margin between heavy native steer hides and harness leather, were greater than any year since 1932.

Hide prices and the price margin between hides and sole leather fell sharply in 1938, a year of general business depression. The margin between hides and harness leather continued to increase in 1938, but fell off slightly in 1939.

If, as petitioner contends, the narrowing of margins and the decrease in profits suffered by the petitioner and the tanning industry during the base period years were a long-term result o fthe drought of

1934, it seems only logical to assume that the depressive effects of the drought would have been particularly apparent in the years 1935, 1936, and 1937, the years immediately following the drought and during which the surplus of hides was greatest. However, as shown above, this was for the most part a period of rising hide prices and widening price margins.

Petitioner's operations during the postdrought period were particularly successful. Harness and collar leather usually accounted for more than 50 per cent of petitioner's total sales, the other major product being shoe-welt leather. Petitioner produced harness leather principally from packer heavy steer hides, and collar and shoe-welt leather from country hides.

The price margins between heavy hides and harness leather broadened considerably between 1935 and 1938. No evidence was submitted as to the annual wholesale price of collar leather specifically; however, the margin between country hides and harness leather, generally, grew almost steadily from 1934 through 1938. Similarly, no evidence was submitted as to the annual wholesale price of shoe-welt leather specifically; however, the price margin between country hides and sole leather, generally, increased markedly between 1934 and 1937.

Petitioner's profits during the fiscal years 1935, 1936, and 1937 were far greater than its profits for any of the other fiscal years 1930 through 1940 or the profits of its predecessor partnership for any of the fiscal years 1921 through 1929.

It is clear that petitioner has failed to show that its price margins, or the price margins of the tanning industry, were narrowed during the base period as a direct or indirect result of the drought of 1934 and has thus failed to establish the cornerstone of its argument.

Petitioner further contends that the drop in farm prices experienced by this country in 1938 was aggravated by long-term effects of the drought of 1934, and that as a result of this decline in farm prices the purchasing power of the farmers in petitioner's midwestern, northwestern, and southern trade areas was reduced with an accompanying decline in demand for petitioner's harness leather.

Petitioner produced no farm income figures relative to its trading areas to reinforce its argument. Furthermore, petitioner's own expert witness admitted that the drought of 1934 had only a minor influence on farm prices for leather in 1938 and 1939.

We are of the opinion that petitioner's reduced profits in the base period resulted not from the drought of 1934 but from the effect of the general business decline of late 1937 and 1938 upon the highly volatile leather industry, and upon petitioner, particularly. Petitioner's president thus characterized the industry—

The tanning industry is one which is affected to a marked extent by price and volume fluctuations and as a result thereof the earnings of the leather industry have shown considerably greater variations than in almost any other industry. This results from the nature of the process, length of turnover, high proportion of inventory assets to capital and the extreme swings which occur in raw material prices.

Such factors are, however, no basis for relief under section 722.

Petitioner has not shown a causal relationship between the events relied upon for relief and its reduced earnings, or the reduced earnings of the tanning industry during the base period years.

We must conclude that petitioner has failed to prove that its business was depressed during the base period because of the drought of 1934 or because the tanning industry, of which it was a member, was depressed as a consequence of the drought. Cf. *Trunz, Inc.*, 15 T.C. 99 (1950).

Respondent correctly denied petitioner's claims for relief under section 722(b)(2).

Reviewed by the Special Division.

*Decision will be entered for the respondent.*