EL CAMPO RICE MILLING COMPANY, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 6176, 11957. Promulgated November 21, 1949.

George E. H. Goodner, Esq., and Scott P. Crampton, Esq., for the petitioner.

Irene P. Scott, Esq., and D. Louis Bergeron, Esq., for the respondent.

## OPINION.

Johnson, *Judge*: Petitioner charges respondent with error in refusing to grant any relief in respect of its excess profits taxes for the fiscal years ended June 30, 1941, 1942, 1943, and 1944, arguing that the grounds urged in its rejected applications entitle it to the benefits of section 722, Internal Revenue Code. This section was designed to "afford relief in meritorious cases to corporations which bear an excessive tax burden because of an abnormally low excess profits tax credit." Senate Finance Committee Rept. No. 1631, 77th Cong., 2d sess. By subsection (a) [1] a taxpayer who demonstrates that his excess profits tax, as normally computed, is "excessive and discriminatory" and establishes "a fair and just amount representing normal earnings" may compute his credit by use of that amount in lieu of the invested capital method or his average net income for the statutory base period years 1936–1939. By subsection (b) the normally computed excess profits tax shall be considered "excessive and discriminatory" if the average base period net income is "an inadequate standard of normal earnings because" of several specified reasons. Of these reasons, petitioner first cites the following as applicable to it:

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry.

Petitioner contends that its business was depressed during the base period because of "a price depression, an adverse price movement and an abnormally low profit margin." Admitting that no one of these factors is "unique," it submits that the concurrence of all three to the degree shown was "unusual" within the meaning of the statute and that the depression which they caused and the consequent effect on its excess profits credit resulted in an excess profits tax that should be considered "excessive and discriminatory." Disregarding the dis-

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that in the cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

junctive character of the two types of causes described in subsection (b) (2), its counsel merges his reasoning as to both, concluding with the statement that the question for decision is:

\* \* \* whether the years 1936–1939 are a fair measure of normal earnings. Since it is apparent that the petitioner and its industry were temporarily depressed in the base period, it logically follows that that period does not provide a fair test. \* \* \*

This statement is an oversimplification of the issue. Even if the base period income "does not provide a fair test," it must still serve as a measure for computing the excess profits credit unless the taxpayer establishes that its base period business was depressed and that this depression resulted from one or more of the specified causes. Petitioner introduced the testimony of Dr. Elgin Groseclose, an economist of broad experience, who had carefully prepared a number of statistical tables, price index charts, and illustrative graphs indicating that during the base period the average New Orleans prices for all types of rough and milled rice and the "milling margin," or spread between comparable quantities of the two, was less than such averages for the years 1922–1939; that rough rice prices averaged only 69.4 per cent of parity during the base period; and that, while the index of all commodities during such period was 93.51 per cent of the 1922–1939 average, the price of rice was only 79.09 per cent. It was the witness' opinion that a depression in petitioner's milling business was indicated by these figures, and under that theory petitioner proposes a reconstructed normal base period income computed by swelling the base period's annual gross sales to the amount that the mean price of rice at New Orleans for 1923–1940 would have provided and by increasing gross milling profits so as to reflect the mean milling margin for 1923–1940.

We have given to the charts, computations, and explanations of the witness a careful study, but are of opinion that they fall short of establishing that petitioner's business was depressed because of temporary circumstances unusual in its case. Factually, there was no "adverse price movement" in the New Orleans rice market during the base period. There was merely fluctuation, which at the end of the period was ascending. The average price of milled rice was 3.91 cents a pound in 1936, 2.95 cents in 1937, 2.81 cents in 1938, and 3.5 cents in 1939. The market value of petitioner's milled rice for its fiscal years 1937–1940 likewise fluctuated, being 3.66 cents in 1937, 2.71 cents in 1938, 2.81 cents in 1939, and 3.01 cents in 1940. There were fluctuations in the price of rough rice and in the "milling margins," but no steady adverse movement. While the calendar year and petitioner's fiscal year are not coterminous, we note in any event such differences between petitioner's prices and the New Orleans averages

as to render the latter a questionable standard for judging of petitioner's experience.

But it is unnecessary to do so, for petitioner's earnings bear no visible relation to the price of rice, rough or milled. This is obvious from a cursory examination of the schedules set forth in the findings of fact. If the volume and operating costs of its milling had been relatively constant, it might be reasonably assumed that potential profits would bear a fixed relation to the "milling margin." But the evidence eliminates even this inference. Petitioner's volume was subject to very great variation from year to year throughout the 1923–1940 period. It ranged from a low of 87,994 barrels in 1928 to a high of 236,897 barrels in 1938, and contained such sharp differences as 119,216 barrels in 1931 against 210,287 in 1932. Likewise, its profits would seem to have no relation to the milling margin even in comparable income years. It earned, for example, about $27,000 in both 1925 and 1937, but its volumes were 98,851 and 178,055 barrels and its milling margins were 17.17 per cent and 13.39 per cent for the respective years. In three of the six years during which it constantly sustained heavy losses, its milling margin was in fact in excess of the 13.39 per cent margin of 1937, when it realized income of $6,687.15. Since all the above mentioned fluctuations recurred constantly over the period 1923–1940, as our findings indicate, they were neither temporary nor unusual, and we perceive no casual connection between them and earnings.

According to petitioner's manager, R. H. Hancock, profits in the rice milling business depend on "how well you guessed on how much to buy." Hancock, Dr. Groseclose, and respondent's expert economist, Dr. A. J. Weaver, were in agreement that the business was highly speculative and that the amount of inventory which a mill carries is usually determinative of the amount of profit or loss according to subsequent price fluctuations. These fluctuations are not readily ascertainable or reasonably predictable as in the case of wheat, corn, or cotton, for which a central market or exchange exists and crop statistics are currently published. Because of this highly speculative element, Hancock described the rice milling industry as one of "feast or famine." And such a condition is evident even within the base period, for petitioner earned $30,801.65 in its fiscal year 1937, or almost triple its base period average of $10,991.54, while it lost $5,078.72 in its fiscal year 1939 and earned $11,556.07 the year following. We have held a taxpayer entitled to relief under the first clause of subsection (b) (2) upon a showing that its base period earnings were substantially below the average of many years because of difficulties with organized labor, an adverse factor peculiar to it. *Dyer Engineers, Inc.*, 10 T. C. 1265. But we have denied relief where low earnings were attributable to

keen competition, for that circumstance is neither unusual nor temporary, but "the very essence of our capitalistic system." *Lamar Creamery Co.*, 8 T. C. 928. We fail to see that the fluctuations in the market price of rice and the mathematically resultant "milling margins" were temporary or unusual or that they can even be correlated to earnings.

Petitioner contends further, however, that it is the member of an industry which "was depressed by reason of temporary economic events unusual in the case of such industry"—the second clause of subsection (b) (2). Again it suggests nothing other than the concurrence of price depression, adverse price movement, and abnormally low profit margin as the unusual temporary economic event which caused the alleged depression. Without having in evidence the income experience of the industry as a whole or indeed of any other rice mill, we are asked to assume that petitioner's experience was typical. After alleging inability to procure general statistics on the industry, Dr. Groseclose reasoned that, since petitioner's business was exclusively in rice and had undergone no change in capacity, management, or methods for eighteen years, conditions affecting it must have been generally prevailing in the industry.

In the absence of published statistics on rice milling, we can appreciate petitioner's difficulties in procuring evidence that the industry was depressed during the base period, but we can not for that reason excuse petitioner from its burden of proving a fact essential to its contention. Even in the case of a taxpayer engaged in a type of business in which given factors produce a fairly predictable effect on earnings, we could not accept the taxpayer's experience without more as an index of trends in the whole industry's income. *A fortiori*, we can not do so here, for the highly speculative element in rice milling, the role of inventory in profits, and the lack of any apparent relation between petitioner's volume of business, rice prices, mill margins, and other details which have been placed in evidence affirmatively rebut any inference that millers' incomes in general can be correlated to a pattern based on the data in evidence or on the experience of one miller. We can make no finding that the milling industry was depressed in the base period by unusual, temporary economic events or for any other reason, and must reject petitioner's contention that the evidence supports an application of either clause of subsection (b) (2).

This failure of proof also requires a rejection of the final contention based on subsection (b) (3) (A), which provides that the normally computed excess profits tax is to be considered excessive and discriminatory if the taxpayer's average base period income is an inadequate standard of normal earnings because:

(3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

(A) a profits cycle differing materially in length and amplitude from the general business cycle  *  *  *.

Under the assumption that the curve of petitioner's earning experience reflects "conditions generally prevailing in its industry," Dr. Groseclose compared that curve with a second curve representing the taxable income experience of all United States corporations for the years 1922–1939. The graph places in bold relief the great extremes of petitioner's earnings and losses as compared with the less undulating line of general corporate experience, and shows further that petitioner sustained heavy losses in the generally prosperous years 1926–1929, while a sharp rise in its income occurred during the depression years 1931–1935. In 1936, after the price agreement program of the Department of Agriculture was discontinued, a decline in its earnings was precipitate.

The parties' expert witnesses, both of whom made a forceful presentation of their differing views, were in sharp disagreement over the significance of petitioner's income curve. Dr. Weaver, stressing the highly speculative character of rice milling and the effect of unprecedented market control by the price agreement program in 1934–1935, was of opinion that the curves demonstrated the total absence of any pattern of cyclical behavior. Dr. Groseclose reasoned that the extremes of fluctuation, varying so markedly in trend and in such degree from the general corporate experience curve, made it manifest that petitioner was subject to a profits cycle which differed materially in length and amplitude from the general business cycle, and he concluded that, as petitioner's base period income was depressed by reason of "conditions generally prevailing in its industry," its average base period net income was an inadequate standard of normal earnings.

We deem it unnecessary to decide whether or not petitioner's highly erratic line of earning experience can properly be regarded as indicating cyclical behavior. To be of any significance for an application of section 722 a cycle, if established, must have been caused by conditions generally prevailing in the industry, and petitioner has shown no such conditions. The market price of rice and the mill margins would not do so for the reasons above set forth. Dr. Groseclose, after candidly stating that an economist who could give the causes of any profit cycle "would be a prophet without peer," expressed the view that the absence of a central market, the very important role of inventory in the earning of profits, and the necessity for allowing rice land to lie fallow after two or three successive crops were unsettling condi-

tions which tended to create a cyclical variance in the miller's income. We agree that the conditions mentioned, by their nature, affect the whole industry, as Dr. Groseclose asserted, but we are not convinced that they cause or contribute to a profit pattern that is cyclical. The very stress which he and Hancock placed on the miller's inventory and the greatly varying volumes of rough rice which petitioner processed from year to year suggest rather that profits reflect how well the miller "guessed on how much to buy."

The accuracy of managerial judgment is susceptible of no cyclical pattern. If the managers of competitive mills made better or worse guesses than Hancock during the base period, it is to be supposed that other mills had greater or lesser base period income. Dr. Groseclose was of opinion that, since subsection (b) (3) (A) refers to a profits cycle to which the *taxpayer* is subject, there was no necessity to show the profit pattern of other mills, it being enough that conditions considered as causing the cycle generally prevailed in the industry. We can not accept this view, for if the cited condition caused a profits cycle at all, that cycle would also be generally prevailing in the industry. If other mills' base period earning records varied widely from petitioner's and from one another, it would seem obvious that the cited conditions failed to cause a cycle or indeed that there was a cycle for any cause. The present record, lacking in evidence about other mills' income, not only fails to show any profits cycle for the industry which could have resulted from the alleged causes, but indicates, on the contrary, that the profit of each member varied with the manager's decisions as to inventory and could be great or small according to subsequent market prices difficult to predict in advance. On this record we do not find that petitioner has established the existence of any cycle variant within the meaning of subsection (b) (3) (A).

Apart from the factual conditions prescribed by the subordinate parts (2) and (3) (A) above considered, subsection (b) is in general applicable only if a taxpayer's "average base period net income is an inadequate standard of normal earnings." Petitioner has assumed, without arguing, that its average base period net income was inadequate. On brief its counsel states that it "and respondent agree wholeheartedly that the rice milling business was depressed in the base period," a fact which Dr. Weaver, respondent's witness, "could hardly emphasize enough." Respondent denied any such agreement, and a careful examination of Dr. Weaver's testimony discloses an opinion that the southern rice milling industry suffers from a "permanent depressed state caused largely by its overcapacity and by its aggressive and destructive competitive tactics." Dr. Weaver later expressed the view that the base period years were "quite normal for the rice industry for reasons * * * stated before."

In its brief and exhibits petitioner has not set forth any comparison of its average base period income with its average annual income for the period 1923–1940. On its tax returns and various applications for relief it reported a base period net income ranging from $9,647.59 on the 1941 return to $16,617.69 on some of the relief applications. Our computation, based on the amounts finally determined by respondent, indicate an average annual net income of $10,991.54 for the four base period years against an average annual net income of $11,804.73 for the fiscal years 1923–1940. These figures indicate that the base period earnings were somewhat under the long term average, but, as we said in *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220: "The mere fact that base period profits were not large would not necessarily mean that the business was depressed." Likewise, that fact would not mean that the base period profits were an inadequate standard of normal earnings. Cf. *Irwin B. Schwabe Co.*, 12 T. C. 606.

A study of Dr. Groseclose's profit graph discloses less fluctuation in petitioner's income experience during the base period than during any other four years charted. Since the maximum profits were realized during the years when the agreements and price controls of the Department of Agriculture were in effect, it is obvious, moreover, that the annual average of the 1923–1940 period was raised by profits artifically inflated. As the base period average is only $813.19 less than the 1923–1940 average, we would have difficulty in holding that the former was an inadequate standard of normal earnings or that petitioner's business was depressed during the base period even if the evidence presented were persuasive of the existence of temporary and unusual circumstances or events affecting profits. Cf. *Fish Net & Twine Co.*, 8 T. C. 96. But the evidence is not persuasive of these essential facts, and petitioner's reconstruction of an average base period net income of $75,000 graphically points up the impropriety of the computation factors on which it relies, for its earnings during 1923–1940 averaged only $11,804.73 annually, and no single year's profit ever approached $75,000 except that for the fiscal year 1936, when petitioner received large refunds from the United States Government on account of processing tax payments and warrants. We hold that the applications for relief under section 722 were properly denied.

In amending the petition in Docket No. 11957 to assign error in the Commissioner's failure to reflect carry-backs of unused excess profits credits for the fiscal years 1945 and 1946 in computing the excess profits taxes for the fiscal years 1943 and 1944, petitioner's counsel stated that he did not propose to try any issue for the subsequent years, but anticipated that he would thereby be in a position to "agree

with the government as to whether or not there was a carry-back." He has not proved or stipulated that there was, and there is hence nothing in the record which permits of any decision of the matter raised in the assignment.

Reviewed by the Special Division.

*Decisions will be entered under Rule 50.*