Del Mar Turf Club, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket No. 11471.   Promulgated April 12, 1951.

---

[4] H. Rept. No. 2333, 77th Cong., 2d sess., 1942–2 C. B. 372, 417.

*Adam Y. Bennion, Esq.*, for the petitioner.
*R. E. Maiden, Jr., Esq.*, for the respondent.

758

OPINION.

RICE, *Judge:* Petitioner contends it is entitled to relief from excess profits taxes under section 722 (a) [1] and 722 (b) (1), (2), (4) and (5) of the Internal Revenue Code, for the fiscal year ended September 30, 1941. Since the .petitioner claimed relief under subsection (b) (1) for the first time in its opening brief and since the record does not disclose "any other factor affecting the taxpayer's business which may reasonably be considered as resulting in an inadequate standard of normal earnings during the base period" under subsection (b) (5), claim for relief under such provisions is denied. *Blum Folding Paper Box Co.,* 4 T. C. 795 (1945); *Monarch Cap Screw Manufacturing Co.,* 5 T. C. 1220 (1945).

This leaves for our consideration whether, on this record, the petitioner qualifies for relief under section 722 (b) (2), section 722 (b) (4), or both.

Petitioner claims it qualifies for relief under section 722 (b) (2)[2]

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939. * * *.

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

* * * * * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

* * * * * * *

because the normal operation of its business was diminished due to the occurrence during the base period of events unusual and peculiar in the experience of the petitioner, or because petitioner's business was depressed during the base period due to temporary economic circumstances unusual in the case of the petitioner and its industry. We will limit our discussion under the (b) (2) issues to the petitioner's individual business as this record does not support a finding that petitioner was a member of an industry which was depressed by reason of temporary economic events unusual in the case of such industry.

As set out in our findings of fact, petitioner's operations during the base period years were limited to not to exceed 25 days of racing during its season. Petitioner claims the members of the California Horse Racing Board interpreted the California statute erroneously during this period, that petitioner under the statute was actually entitled to not to exceed 39 racing days, and that the failure of the Racing Board to grant it the additional days was the unusual and peculiar event which depressed its business in the base period. Petitioner points to the fact that in 1941, at the request of the Racing Board, the Attorney General of California rendered an opinion (interpreting the same statute which was in effect during the base period years) that petitioner was entitled under such statute to not to exceed 39 racing days. Petitioner argues that if the Racing Board had so interpreted the statute during the base period years that petitioner would have been allotted 39 days for its racing season as a matter of course, because the Racing Board had always granted to other race tracks the maximum number of racing days allowable under the law and there was no reason for supposing that it would limit petitioner to less than the allowable 39. Petitioner argues further that if it had been allotted 39 days, it would have raced more days than it raced in the base period and its average daily handle and, therefore, its average base period net income would have been greater than it was.

Respondent argues that petitioner's contentions indulge several assumptions, each of which must be supplied with at least some reasonable basis in fact before this Court would be justified in finding that the failure to allot more than 25 racing days had any depressing effect on petitioner's base period earnings. He specifies these assumptions as (1) that the Racing Board would have permitted petitioner to race more than 25 days during the base period meetings; (2) that petitioner would have requested more than 25 days, and (3) that petitioner could have raced profitably the days allotted to it by the Racing Board in excess of 25.

No member of the Racing Board testified in this case. The attorney for petitioner talked to Mr. Carlton Burke, who was Chairman of

the California Horse Racing Board during 1937 and 1938 and who was ill and in the hospital when this proceeding was heard, and related to the Court a summary of his conversation with Mr. Burke as follows:

I questioned him about the matters in controversy here, and he told me that he had no recollection of any discussions with officers of Del Mar regarding the number of days that Del Mar was entitled to, but that it was his opinion—and he was definite in this—it was his opinion in 1937 and 1938 that under the wording of the California Horse Racing Act a commercial race track in San Diego County was entitled to a maximum of 25 days of racing, and that an additional 14 days was allowable only to County fairs.

Respondent stipulated that Mr. Burke would have so testified if he had appeared in court as a witness.

The question of the allotment of the number of racing days to petitioner in any one year, as was true of all tracks in California, so long as it did not exceed the statutory maximum, was a matter wholly within the discretion of the Racing Board. It required consideration not only of petitioner's desires but the desires of all the tracks, including the state and county fairs which also held racing meets, as well as consideration of the racing program as a whole, during an entire year so as to carry out the purposes of the Act to promote the breeding of race horses in California, the state and county fairs, agriculture and education in general, and last, but not least, revenue with which to carry out such purposes.

In addition to lack of evidence in the record that the Racing Board would have permitted petitioner to race more than 25 days during the base period years, even if it had been of the opinion that the maximum allowable under the Racing Act was 39 days, the record indicates, on the other hand, that petitioner was satisfied with the maximum of 25 racing days during the base period years. Petitioner requested 25 racing days for its 1937 meet which was granted. Subsequently petitioner requested the Racing Board to change such allotment to 22 days which was granted and that was the number of days it raced. in 1937. Petitioner requested and was granted 25 racing days for its 1938 meeting and raced the full 25 days which was the only time during the base period years it raced the full 25 days. It raced 24 days during its 1939 season and 23 days during its 1940 season.

Irrespective of the evidence or lack of evidence in this record with respect to how many racing days the Racing Board would have allotted to petitioner during the base period years, the fact remains that the number of days authorized to be allotted, up to a certain maximum, was entirely within the discretion of the Racing Board. Since the Board never allotted more than 25 days to petitioner and since such allocation is not alleged or shown to be an abuse of discretion, the Board remained within its statutory authority and its actions were

the normal, usual, and permanent conditions of petitioner's business and the industry as a whole.

Petitioner, in order to gain relief under the subsection (b) (2) issue discussed above, must establish that its average base period net income is an inadequate standard of normal earnings because its business was depressed in its base period; that the cause of the depression was a temporary economic event unusual in the case of petitioner, and, finally, what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. Since the petitioner has failed to show that the action of the Racing Board in failing to allot more than 25 racing days to it in its base period was a temporary economic event unusual in the case of petitioner, it has failed to establish the requirements of the statute on this issue and no relief can be granted. *El Campo Rice Milling Co.*, 13 T. C. 775 (1949) ; *Lamar Creamery Co.*, 8 T. C. 928 (1947). See also *Acme Breweries*, 14 T. C. 1034 (1950).

Petitioner also claims it qualifies for relief under 722 (b) (4) [3] because (1) it commenced business in 1937, during the base period; (2) its average base period net income of $39,766.31 does not reflect the normal operation for the entire base period, and (3) such average does not reflect the earning level that petitioner would have reached by the end of the base period if the business had been commenced in 1935.

Petitioner was on a fiscal year basis ending September 30. It conducted its first race meeting beginning July 3, 1937, and is entitled to use the excess profits credit based on income pursuant to section 713 of the Code.

The first question presented in connection with petitioner's (b) (4) claim is whether or not its average base period net income of $39,766.31 reflects the normal operation of petitioner for the entire base period.

---

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

    \*        \*        \*        \*        \*        \*        \*

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—That tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

    \*        \*        \*        \*        \*        \*        \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. \* \* \*

Petitioner's actual experience during the 4 years of its base period was as follows:

| Fiscal year ended Sept. 30 | Total handle | Average daily handle | Gross revenue | Net profit from racing | Excess profits net income |
|---|---|---|---|---|---|
| 1937 | $2,224,301 | $101,105 | $317,797.83 | $17,343.84 | $11,302.84 |
| 1938 | 3,920,251 | 156,810 | 524,686.23 | 61,310.50 | 35,010.15 |
| 1939 | 3,469,965 | 144,582 | 456,406.69 | 18,979.24 | 47.99 |
| 1940 | 4,417,733 | 192,075 | 571,610.97 | 140,200.04 | 101,410.12 |

The above table shows that petitioner's handle, gross revenue, and net profit increased in each of its base period years with the exception of 1939. During 1939, the record indicates that race tracks in California and elsewhere experienced some decline in revenue.

Respondent argues that the last base period year did not reflect "normal operation," since the income of that year contained abnormal income influenced by economic conditions "greatly swollen and ballooned by reason of the preparation for war  *  *  *"; and that if such abnormal income were eliminated, petitioner would have a reconstructed income representing "normal operation" in an amount less than its average of $39,766.31. Respondent also argues that petitioner reached its normal level of operation in 1938, its second year of existence. We can not agree with respondent on this issue.

Based upon the entire record of this case, and after comparing the development period of petitioner with the other California commercial tracks, we conclude that petitioner had an initial development period of approximately five years. In addition to the usual development problems experienced by all commercial race tracks in California, petitioner had other problems to face. It was 110 miles south of Los Angeles and a substantial part of its patronage came from the Los Angeles area. Also, the Chicago Circuit, the New York Circuit, the New England Circuit and the New Jersey and Maryland Circuits were operating at the same time that the petitioner raced. Owners and trainers of horses were accustomed to scheduling their racing operations at these eastern tracks which increased petitioner's development problem of becoming integrated into the national racing picture. We, therefore, further conclude that petitioner's average base period net income of $39,766.31 is an inadequate standard of normal earnings because it does not reflect the normal operation of the business in a fully developed state for the entire base period; that it did not reach by the end of the base period the earning level that would have been reached by the end of the base period if the business had been commenced in 1935 instead of 1937, and that, as a consequence, petitioner qualifies for relief under section 722 (b) (4).

It is appropriate to note at this point that there is no statutory prohibition against our looking at post-1939 events in order to determine

whether petitioner qualifies under section 722 (b) for a reconstruction of its base period net income. The statutory prohibition against regarding post-1939 events relates only to the reconstruction of the average base period net income. *East Texas Motor Freight Lines*, 7 T. C. 579, 587 (1946) ; *Dyer Engineers, Inc.*, 10 T. C. 1265, 1274 (1948) ; Commissioner's Bulletin on Section 722, Part V, Subpart II.

Since petitioner's average base period net income is an inadequate standard of normal earnings during the base period, the next question is what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income. Because of the varying lengths of meets at the different tracks, the most reasonable basis on which to reconstruct petitioner's base period income would seem to be its average daily handle, as the net income of a race track bears a direct relation to the handle and can be estimated with reasonable accuracy after the handle is known.

Petitioner's reconstruction, argued for in its brief, was based upon a misconception of the application of the 2-year push-back rule. Petitioner reconstructed an average daily handle for 1935 using its actual daily handle for 1937 and readjusting it downward on the basis of lower individual incomes for 1935 as compared with 1937. It then went forward reconstructing an average daily handle for 1938 and 1939, assumed one for 1940, and reconstructed a fourth for 1937.

The purpose of the 2-year push-back rule is to establish a figure which is assumed to be the maximum amount which would have been earned by the taxpayer in its last base period year, if it had commenced business 2 years before it did. Once one has arrived at this assumed figure, the function of the 2-year push-back rule has been achieved and we are no longer concerned with it. Such assumed figure is then used as a point of departure in reconstructing the taxpayer's average base period net income (using appropriate indices based on national income, state income, industry experience, corporate profits, etc.) in order to determine his excess profits credit. See *Suburban Transportation System*, 14 T. C. 823, 829 (1950).

Since we can not use petitioner's reconstruction as it is based on an erroneous conception of the 2-year push-back rule and since respondent denied any relief to petitioner and therefore submitted no reconstruction, it is appropriate for us to make a reconstruction which we think is reasonable based on the entire record.

Our first problem, therefore, is to reconstruct the average daily handle petitioner would have achieved during its last base period year ended September 30, 1940, if it had commenced business in 1935. This may be achieved by using a growth index based upon the experience of the three older tracks, Tanforan, Bay Meadows, and Santa Anita, and applying said index to petitioner's average daily handle for its first year of operation. The result will be an average daily handle for

petitioner's assumed sixth year of òperation (fiscal year 1940) comparable to the growth experience of said three tracks. For purposes of comparison, we can also reconstruct petitioner's average daily handle for its four base period years by using a national income index, a California income index, and a corporate profits index.

Inasmuch as petitioner's costs and expenses were fairly uniform from year to year and our reconstructed average daily handle takes into account the fluctuations in petitioner's industry during the base period, a single computation of constructive average base period net income is indicated, as approximately the same result would obtain if separate computations were made for each year and the figure then averaged. *7-Up Fort Worth Co.*, 8 T. C. 52, 67 (1947). We have heretofore held in this opinion that petitioner failed to show that the action of the Racing Board in failing to allot more than 25 racing days to it in its base period was a temporary economic event unusual in the case of petitioner, entitling it to relief under section 722 (b) (2). Therefore, in the reconstruction allowed herein, only 25 racing days are permitted.

The reconstruction of petitioner's expenses can be made with some certainty. These expenses fall into four categories as follows:

1. Expenses which vary in relation to the number of days of racing. These consist primarily of the purses, supplies, utilities, and salaries of the many individuals who are employed either on a daily basis or for a racing season of a given number of days.

2. Fixed expenses which remain constant regardless of the number of days raced or the volume of the handle. These consist principally of the amortization of the franchise payment of $100,000, depreciation of furnishings, amortization of leasehold improvements, and much of the fixed administrative overhead expense.

3. Two expenses which vary directly with the volume of handle, namely, the plant rental and the rental of the totalizator board.

4. Two expenses which vary in accordance with net income, namely, the bonus of 10 per cent of net income before taxes to the director of racing and the California franchise tax of 4 per cent of net income.

The table of expenses included in our Findings of Fact shows the constancy of petitioner's expenses which were fixed expenses. Thus, the fixed expenses amounted to $58,808.75 in 1937, $68,837.69 in 1938, and $69,126.62 in 1939, although there was a large difference in total handle between the three years. Said table also shows that the per day expenses (the expenses which vary with the number of days raced) amounted to $9,035.90 in 1937, $11,752.95 in 1938, and $12,618.03 in 1939. Therefore the fixed expenses and the per day expenses may be reasonably reconstructed upon the average of said 3 years of $66,000 and $11,200, respectively.

Two expenses which vary in direct relationship to the total handle are plant rental and totalizator rental. The following table shows for the years 1937, 1938, and 1939 the percentage which these two expenses bore to the total pari-mutuel handle:

|  | 1937 | 1938 | 1939 |
|---|---|---|---|
| Pari-mutuel handle | $2,224,301.00 | $3,920,251.00 | $3,469,965.00 |
| Plant rental | 27,387.96 | 46,893.08 | 41,830.96 |
| Totalizator rental | 12,441.50 | 23,370.51 | 22,026.94 |
| Total | 39,829.46 | 70,263.59 | 63,857.90 |
| Per cent of pari-mutuel handle | 1.8 | 1.8 | 1.8 |

Based upon the foregoing figures it is seen that these two expenses may reasonably be reconstructed upon the basis of a reconstructed pari-mutuel handle.

Expenses based upon net income are the 10 per cent bonus to the director of racing and the 4 per cent California franchise tax. Inasmuch as the 10 per cent bonus would be deductible in computing the 4 per cent California franchise tax, that tax in effect would be 4 per cent of 90 per cent of the net income after the bonus had been deducted, or 3.6 per cent of the net income before deduction of the bonus. Hence, to cover both sums adequately it is sufficient merely to deduct 13.6 per cent of the net income.

Petitioner also contends that it is entitled to a further deduction for interest payments made during the base period years because they were abnormal payments and, by reason thereof, tended to depress its base period earnings. The interest payments amounted to $62,679.79 during the base period years. The interest was paid on money borrowed by petitioner and loaned to the Twenty-second District Agricultural Association, a political subdivision of California, to complete construction of the race track at Del Mar. Petitioner was unable to charge the interest to the Association as it was a state agency. Respondent argues that petitioner neither claimed in the application for relief nor in the petition that this factor caused its business to be depressed and the issue is therefore not properly before us. Respondent concedes that if this Court permits the use of the push-back rule petitioner would be entitled to some adjustment for such interest payments. It is our view, however, that petitioner is not entitled to any additional allowance by virtue of such interest payments as the reconstruction granted hereunder gives petitioner a reasonable reconstructed average base period net income for purposes of its excess profits credit and no further allowance is warranted.

By way of summary, a reasonable reconstruction in this case is arrived at by multiplying the reconstructed average daily handle by

25 racing days, taking 13 per cent of that figure for gross income, and by deducting therefrom the sum of the reconstructed expenses, the state franchise tax, and the reconstructed average Federal income tax for the base period.

We, therefore, finally conclude, based upon the entire record of this case and in accordance with the standards enunciated herein, that petitioner is entitled to use a reconstructed average base period net income in the sum of $125,000.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*