EDGEWATER STEEL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 10763, 10764. Filed January 11, 1955.

614

*Lee W. Eckels, Esq.*, for the petitioner.
*A. W. Dickinson, Esq.*, for the respondent.

618

620

624

OPINION.

LeMire, *Judge:* The petitioner contends that its excess profits taxes for the calendar years 1940, 1941, and 1942 are excessive and discriminatory because of the existence of factors specified in subsections (b) (2) and (b) (4) of section 722 of the Internal Revenue Code of 1939.

The primary basis for relief under (b) (2) is an alleged depression in its base period sales to railroads of equipment for rolling stock maintenance because of a temporary and unusual circumstance of a severe decline in the equipment maintenance expenditures of the railroad industry.

The petitioner is a fabricator of various steel products. The major portion of its net income is derived from the sale of products used by the railroad industry, although a considerable portion of its net income is derived from the sale of products used in other industries. However, the petitioner does not claim a base period depression in its non-railroad sales.

The parties are agreed that the expenditures by the railroad industry during the base period were curtailed. They differ as to whether this was the result of a temporary and unusual circumstance within the purview of the statute. Numerous schedules, charts, and graphs have been presented in support of the respective positions of the parties. A critical analysis of such evidence persuades us that the depression in the railroad industry was not by reason of temporary economic events unusual in the case of such industry but was the result of a persistent long-term declining trend which commenced considerably prior to the base period. This record is replete with evidence that the railroad industry was a declining one prior to, during, and beyond the base period. The primary reason for the declining trend of the railroad industry is the development of transportation media competitive with the railroads. The extremely rapid growth of the automotive passenger and truck transportation, the sharp increase in transportation facilities afforded by air carriers, water carriers, and pipe lines, set forth in our Findings of Fact, attest to the ruinous competition to which the railroad industry was subjected. The statistical data presented show the existence of a persistent declining trend in the railroad industry generally and, also, in the maintenance equipment industry. This record does not establish that the business of the railroad industry or that of the maintenance equipment industry was depressed because of a temporary

and unusual circumstance such as constitutes a qualifying factor within the purview of subsection (b) (2) of section 722 of the 1939 Code.

The petitioner's sales to the railroads and the railway equipment industry in its base period were not depressed below normal levels. The petitioner's average annual sales to railroads for the long period 1922 through 1939 were $2,584,585, for the period 1922 through 1935 were $2,577,228, and for the base period 1936 through 1939 were $2,610,334. The petitioner's average annual sales to non-railroad industries were also greater in its base period than in the extended periods 1922 to 1939 and 1922 to 1935. During the base period the average of such sales was $1,390,326, whereas the average was $391,776 for the period 1922 through 1935, and $613,676 for the long period 1922 through 1939.

The petitioner's business was not depressed in the base period when analyzed in relation to its entire business. The petitioner's average total sales were $4,000,660, whereas its average sales for the 18-year period 1922 through 1939 were $3,198,261. The base period average annual sales were higher than for any prior 4 consecutive years and exceeded any single year in its prior experience.

The petitioner's annual gross profit was $1,440,495 as compared to an average of $1,260,180 for the 18-year period 1922 through 1939.

The gross profit in three of its base period years was exceeded in only two prior years. The average annual sales price per ton was $121.91 in the base period compared to an average of $110.05 for the long period 1922 through 1939. If the unusual sale of ingots to Japan in 1937 is excluded, the sales price per ton is increased to $129.75 and $111.63 for those respective periods. The average annual gross profit per ton for the base period was $43.90 and $43.36 for the long period. The net profit per ton for the base period was slightly less than for the long term. If the unusual sale of ingots to Japan is excluded the net profit per ton is greater for the base period than that for the long period 1922–1939.

The average annual base period net income of the petitioner was $743,214 for the base period, whereas its average for the period 1922 through 1939 was $685,969. The average base period net income also exceeds the average for the shorter periods 1922 through 1935 and 1930 through 1939.

This Court has used the long period 1922 through 1939 as a test period where appropriate. *Foskett & Bishop Co.*, 16 T. C. 456; *Industrial Yarn Corporation*, 16 T. C. 681; *El Campo Rice Milling Co.*, 13 T. C. 775. Cf. *Ainsworth Manufacturing Corporation*, 23 T. C. 372.

The figures hereinabove set out, and which are summarized from schedules set forth in our Findings of Fact, show that by almost every test the business of the petitioner was not depressed in the base period. The initial requirement of the statute is a depression in the taxpayer's business. Average net earnings in excess of the long-term average of

the business as an entity demonstrate here that the base period is not an inadequate standard of normal earnings. The average net profits shown here indicate that the base period was not one in which the business of the petitioner was depressed. *A. B. Frank Co.*, 19 T. C. 174.

The petitioner further contends as a basis for relief under (b) (2) that in 1937. and 1938 the cost of its principal raw materials was abnormally high and because of market conditions its selling prices did not fully compensate for such abnormally high material cost. As a consequence it is claimed that its gross profit was narrowed, and its net income in those 2 base period years was temporarily and unusually depressed below its normal levels. This point was not raised in either petitioner's original or amended claims for relief under section 722, but is raised in its amended petition. Therefore, consideration of this basis for relief is beyond the scope of review by this Court. *Blum Folding Paper Box Co.*, 4 T. C. 795.

We next consider the petitioner's contention with respect to its claim for relief under section 722 (b) (4) by reason of the installation within the base period of five new boring machines and the addition in June 1937 of small mill No. 3, which was specifically designed for the fabrication of intermediate sized rings. The petitioner claims that, by reason of its increased capacity for operation, its average base period net income does not reflect the normal operations of the business for the entire base period and seeks the benefit of increased earnings on the basis of an extension of 2 years.

The new boring machines installed by petitioner during the base period were of improved design and undoubtedly enabled faster and more efficient machining of its products. We are not satisfied that the petitioner has sustained its burden of showing increased earnings which are specifically traceable to the installation of the boring machines.

With respect to the addition of small mill No. 3, the record shows that prior to the time it was put into operation in June 1937, the petitioner had made intermediate sized rings on its big mill and its small mills Nos. 1 and 2. They were not, therefore, a new product but one in which the petitioner had considerable experience in making prior to the base period. Because it was not economical to make intermediate sized rings on its old mills, the petitioner had not actively solicited customers for such rings, but made them for the accommodation of its old customers. Preliminary surveys made in 1935 and 1936 indicated a demand for intermediate sized rings, and the petitioner specifically designed and constructed small mill No. 3 for the purpose of entering that market. The petitioner actively solicited customers for intermediate sized rings while the construction of that mill was in progress. It did not, however, increase its sales force. After the mill was put

into operation the petitioner transferred all orders then on its books and records to the new mill, and no rings were made on the older mills that could be made on its small mill No. 3.

The primary effect of the installation of small mill No. 3 was to decrease sales from the older mills to an extent not readily ascertainable, and we are in doubt as to whether a higher level of earnings resulted. The petitioner had 2½ years in which to reach the normal level of its sales from small mill No. 3 prior to the end of the base period. Since it had experience in making intermediate sized rings, no appreciable lag was required, and it appears reasonable to assume that the normal level of production was reached by the end of 1939. Exhibit 91–M shows the total sales in pounds in 1939 from small mills Nos. 1, 2, and 3 were 6,442,802 pounds, whereas the sales from small mills Nos. 1 and 2 were 7,991,658 in the year 1937.

The petitioner is entitled to use the excess profits credit based on income. It claimed and has been allowed the benefit of the 1939 Code, section 713 (e). In 1938 the petitioner had a deficit in excess profits net income amounting to $59,469.35. Under section 713 (e) (1), as applicable to the taxable years 1940 and 1941, such deficit is excluded from the computation of average base period net income. The effect would be the same as if the petitioner were permitted to increase net income for 1938 by $59,469.35. For the taxable year 1942, section 713 (e) (1) permits the substitution for the deficit net income of an amount equal to 75 per cent of the average net income of the other 3 base period years. The substitute constructive net income for 1938 so computed amounts to $722,768.88. Thus, in lieu of a deficit in excess profits net income of $59,469.35, the petitioner has an actual excess profits net income of $722,768.88.

Assuming the addition of the new small mill No. 3 to be a qualifying factor under subsection (b) (4), we are satisfied that there was no such level of earnings as contended for by the petitioner if the new mill had been installed in 1935 rather than in June 1937. The petitioner used the method of least squares to project adjusted 1938 and 1939 sales an additional 2 years. The reconstructed pounds for the second year of the projection for small mill No. 3 is 8,502,412 pounds, whereas the production of small mills Nos. 1 and 2 during 1937 was only 7,991,658 pounds. The reconstructed pounds for 1938, a relatively poor year for business generally, are 9,457,233.

We are convinced that a proper reconstruction of sales from small mill No. 3, based upon base period conditions and in the light of the facts revealed by the record, would not result in credits based on constructive average base period net income greater than the benefits already allowed.

The final issue relates to the claims for refund under section 711 (b) (1) (J) of the 1939 Code. No deficiency was determined with

respect to the years 1940 and 1941. A deficiency was determined in excess profits taxes for the taxable year 1942 in the amount of $3,287.33.

The respondent mailed two separate statutory notices on February 1, 1946. The notice for the taxable year 1940 related solely to the disallowance of the claim for relief under section 722. The other notice advised that the respondent had determined overassessments in income taxes for the years 1941 and 1942, an overassessment in excess profits tax for 1941, and a deficiency in excess profits tax liability for 1942. It further advised that, pursuant to sections 272 and 732, notice was given of the deficiency mentioned and of the disallowance of the claim for refund asserted in applications for relief under section 722 and the related claim, Form 843, filed November 18, 1944. The related claim referred to petitioner's claim for relief under section 721, involving abnormal income for the year 1941. On May 1, 1946, the petitioner filed timely separate petitions, one relating to the.year 1940 and the other relating to the taxable years 1941 and 1942. On July 30, 1951, the petitioner filed claims for refund for each of the taxable years 1940, 1941, and 1942, based on abnormal deductions under section 711 (b) (1) (J). On January 18, 1952, pursuant to order of this Court, the petitioner filed amended petitions assigning as error the respondent's failure to allow the claims for relief under section 711. The respondent filed amended answers to the amended petitions alleging that the claims for refund under section 711 were barred by the statute of limitations with respect to the taxable years 1940 and 1941.

Assuming, without deciding,' that the claims for refund under section 711 are timely, we think there is presented a question of our jurisdiction to determine the matter of refund with respect to the taxable years 1940 and 1941. This Court has repeatedly held that where no deficiencies have been determined we are without jurisdiction to determine the merits of a claim for refund or credit, due to standard issue adjustments. *Mutual Lumber Co.*, 16 T. C. 370; *Martin Weiner Corp.*, 21 T. C. 470; *Packer Publishing Co.*, 17 T. C. 882, 899; *West Flagler Amusement Co.*, 21 T. C. 486. Until this Court changes its position, we are required to hold that we have no jurisdiction of the claims for refund under section 711 (b) (1) (J) for the taxable years 1940 and 1941.

The taxable year 1942 presents a different situation. A deficiency was determined with respect to the petitioner's excess profits tax liability for that year. No question of timeliness is raised. Our jurisdiction to determine the merits is well established. *E. B. & A. C. Whiting Co.*, 10 T. C. 102; *Sommerfeld Machine Co.*, 11 T. C. 86. The respondent concedes that the petitioner is entitled to a refund in excess profits tax for the year 1942 in an amount to be computed

**630**

under Rule 50, pursuant to stipulation of the parties, and such refund is directed. Other adjustments have been disposed of by stipulation. Reviewed by the Special Division as to the section 722 issue.

*Decisions will be entered under Rule 50.*